UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Milcah Baraona,

    *Plaintiff,*

v.

Village of Niles,

    *Defendant.*

No. 21 CV 1951

Judge Lindsay C. Jenkins

MEMORANDUM OPINION AND ORDER

Plaintiff Milcah Baraona ("Baraona") filed this lawsuit against her former employer Defendant Village of Niles (the "Village") for race discrimination, failure to provide a religious accommodation, hostile work environment based on race and religion, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII").[1] Before the Court is the Village's motion for summary judgment. [Dkt. 37.] For the reasons stated below, the motion is granted.

## I.    Background[2]

The Village of Niles is a public municipal corporation located in suburban Cook County; it operates the Niles Senior Center ("Senior Center"), which provides senior citizens in the area with events and programs. [Dkt. 52, ¶1.][3] In May 2015, Baraona, who is Black and Jehovah's Witness, was hired by the Village as a Program

---

[1]    In her response brief, Baraona withdrew her Americans with Disability Act claim (Count VII), so this Count is dismissed. [Dkt. 51 at 20.]

[2]    The following material facts are taken from the parties' Local Rule 56.1 statements and accompanying exhibits, [Dkts. 38; 52; 55], and are undisputed except where a dispute is noted. The Court presents the facts in the light most favorable to Baraona. *Emad v. Dodge Cty.*, 71 F.4th 649, 650 (7th Cir. 2023).

[3]    Citations to docket filings generally refer to the electronic pagination provided by CM/ECF, which may not be consistent with page numbers in the underlying documents.

Coordinator in the Senior Center. [*Id.*, ¶¶3, 5.] Program Coordinators are primarily tasked with designing and implementing programs and events for Senior Center members. Jaymi Blickhahn ("Blickhahn") and Chrisann Fahy ("Fahy") were also Program Coordinators. [*Id.*, ¶¶2, 6.] Kelly Mickle ("Mickle"), the Senior Center's Department Director, supervised the Program Coordinators; Bernadette Knapik-Warner ("Knapik-Warner") was the Senior Center's administrative assistant. [*Id.*, ¶¶2, 9.]

### A.    Incidents Concerning Baraona's Religion

As a Jehovah's Witness, Baraona adheres to a "literal interpretation of the Bible"—she does not celebrate birthdays or holidays other than the observance of Jesus's death; engage in political activities or "any type of secular involvement in non-Biblical teaching"; or participate in "outside holiday beliefs [or] practices." [*Id.*, ¶59.] Baraona maintains that shortly after being hired, she informed the Senior Center that she does not participate in birthday celebrations or sign birthday cards due on account of her religious beliefs. [Dkt. 55, ¶51.]

Beginning in 2017, Baraona raised several internal grievances alleging discrimination involving Mickle and other Senior Center employees. [*See* Dkt. 52, ¶76.] Baraona asserts that Mickle attempted to "force" her to participate in activities that went against her religious beliefs. [*Id.*, ¶61; *see* Dkt. 55, ¶51.] The first incident, as Baraona recounts it, occurred in 2017 when Mickle convened a staff meeting and presented a birthday gift to a maintenance person. [*Id.*] According to Baraona, "over the course of the next few years," Mickle "always" gave her birthday cards to sign "as they were going around the office" or left them on her desk to sign despite knowing

her religious restrictions. [Dkts. 38-1 at 48; 52, ¶62; 55, ¶51.] Mickle testified that she was unaware of Baraona's religious restrictions until 2018. [Dkts. 52, ¶60; 55, ¶51.] Sometime during the pandemic, Mickle asked Baraona to make a birthday card and attend a celebration for a Senior Center member's 101st birthday; Baraona declined the request and reminded Mickle of her religious restrictions. [Dkt. 52, ¶63.]

At some point during her tenure at the Village, Baraona asserts that Mickle made "dismissive comments" about children who prayed before eating meals and about Baraona writing letters advocating for Jehovah's Witnesses' right to practice their religion in Russia. [Dkt. 55, ¶55.]

During Baraona's employment, the Senior Center hosted an annual holiday party. [*Id.*, ¶53; Dkt. 52, ¶66.] The Village maintains that attendance at the party was not required, and Baraona does not meaningfully dispute this, but the parties do dispute whether Baraona was given the same options as employees who did attend. All Senior Center employees were presented with four attendance and pay options for the event: (1) attend the party and be paid for that time; (2) work and be paid for that time; (3) use paid-time off; or (4) not attend the party and use unpaid time off. [Dkt. 52, ¶66.] Employees who opted to attend the party—which began around 11:00 a.m. and ended around 2:00 or 3:00 p.m.—were permitted to leave when the party ended and still receive compensation for a full workday. [Dkt. 55, ¶53.] Baraona argues, and the Village disputes, that because of her religious restrictions, she was "not given the same accommodations as other employees [who were] compensated for duties not performed." [Dkts. 38-1 at 50; 52, ¶¶66–67; 55, ¶¶53–54.]

### B. Incidents Involving Race

The Court summarizes several other incidents Baraona identifies in support of her race discrimination claim, generally in chronological order.

- Baraona testified that in 2016, some of her vendors—including two Black vendors—were paid late on two occasions. [Dkts. 52, ¶30; 38-1 at 17.] Baraona admits, however, that payments to non-Black vendors booked by non-Black Program Coordinators were also sometimes delayed and that late payments to vendors were generally unusual. [Dkt. 52, ¶30.]
- In 2016, Knapik-Warner brought paperwork to Baraona's office and made a "throwing motion" toward Baraona's desk. [Dkts. 38-1 at 20; 52, ¶31.] Baraona also testified that Knapik-Warner would "abruptly speak Polish" whenever she entered the room. [*Id.*]
- In 2017, Baraona's corporate credit card privileges were suspended after she left a $30 tip on a $40 charge for one of her events. [Dkt. 52, ¶35.]
- In 2017, a Black homeless woman was arrested at the Senior Center for trespassing. [*Id.*, ¶37–38; Dkt. 55, ¶49.] When Baraona expressed concern, Mickle stated that the woman was "getting three square [meals] a day" and a roof over her head while in jail. [Dkt. 55, ¶50.]
- In 2018, Mickle invited Baraona, Fahy, and Blickhahn to participate in a senior health training opportunity. [Dkt. 52, ¶¶39–40.] Fahy and Blickhahn promptly responded, but Baraona did not. [*Id.*] When Baraona expressed interest in attending, Mickle advised her not to attend the same training session as Fahy and Blickhahn to ensure coverage at the Senior Center. [*Id.*] Mickle offered Baraona a different training session to attend. [*Id.*]
- In 2018, Baraona was "subjected to an investigation" prompted by Blickhahn's complaint that Baraona questioned Blickhahn for taking bereavement leave. [Dkt. 55, ¶29.]
- In 2019, Baraona received a written warning (Dkt. 55, ¶20; Dkt. 52, ¶41); was admonished and instructed to complete customer service training (Dkt. 55, ¶16); was reprimanded, (*Id.*, ¶22); and was issued a disciplinary memorandum (*Id.*, ¶28).
- In 2019, at Baraona's request, the Village hired an outside attorney to investigate Baraona's discrimination claims. [*Id.*, ¶58.] The investigator interviewed Senior Center personnel and later, the human resource manager issued a memorandum based on the investigation's findings. [Dkts. 53-10 at 2–7.] The inquiry did not uncover evidence supporting Baraona's discrimination claims, though Baraona disputes whether the investigation was improperly conducted. [Dkts. 55, ¶58; *see also* 52, ¶77.]
- In December 2019, Baraona filed a formal complaint with the Equal Employment Opportunity Commission ("EEOC"). [Dkt. 52, ¶78.]
- In 2020, Baraona was again admonished. [*Id.*, ¶43; Dkt. 55, ¶23.]

- In 2020, Baraona maintains that Fahy misled a Black vendor named Gwendolyn Davis-Loyd ("Davis-Loyd") by informing the vendor that Baraona no longer worked at the Senior Center. [Dkts. 52, ¶45; 55, ¶¶26–27.]
- In April 2020, the Senior Center held a "best mask" contest; Mickle chose the winner of the contest. [Dkt. 52, ¶54.] Baraona maintains that Mickle selected a mask worn by a resident that resembled "black-face" with exaggerated large lips as the winner of the contest. [*Id.*; Dkt. 55, ¶41.] Baraona objected after Mickle asked Baraona to post a photo of the winner on social media. [Dkt. 52, ¶¶55–56.] Mickle replied that the winning mask was not "linked to" Baraona in any way. [*Id.*, ¶57; Dkt. 45-1 at 95–96.]
- In 2021, Mickle claimed that Davis-Loyd complained about communication issues with Baraona. [Dkt. 55, ¶25.] Baraona disputes whether Davis-Loyd ever made such a complaint. [*Id.*]
- On more than one occasion, the Senior Center receptionist stated that "only civilized countries speak English." Mickle laughed at the comment. [Dkts. 52, ¶49; 55, ¶45.]
- Fahy, a Hispanic woman, responded "Me no habla Ingles," when asked difficult questions in front of employees and residents. [Dkt. 52, ¶¶50–51.]
- Fahy used the term "dago tees" once when describing an item of clothing. [*Id.*, ¶52.]

## C.    Performance Evaluations and Termination

As a Program Coordinator at the Senior Center, Baraona received her annual performance evaluation from Mickle each year. [*See id.* at 3–10.] In her 2015 evaluation, Baraona received an "exemplary" review. [*Id.*, ¶7; Dkts. 38-17 at 1; 55, ¶1.] For 2016, Baraona received a good review, though "lower than the year before, with mixed ratings of 'Meets Standard' and 'Above Standard.'" [Dkt. 52, ¶10.] Mickle praised Baraona's programming but noted that the staff experienced "a great deal of internal turmoil and [Baraona] has expressed frustration with the situation." [*Id.*]

Baraona's 2017 performance evaluation was lower than the prior year, with "Meets Standards" ratings in all categories. [*Id.*, ¶11.] Mickle praised Baraona's programming but noted that Baraona had "difficulty this year with communication, which occasionally resulted in misunderstandings and frustration among team

members. She needs to work on expressing her views in team meetings as well as listening to the opinions of others." [*Id.*] Baraona agrees that the work environment became more challenging but disputes Mickle's criticism, asserting that only Mickle had difficulty communicating with her. [*Id.*, ¶12.]

Mickle maintained contemporaneous notes regarding her communications with Baraona in 2017; she wrote that Baraona appeared to still be having difficulty with Knapik-Warner and had begun to isolate herself in the office. [*Id.*, ¶13.] When asked to interact more with Knapik-Warner, Baraona responded that Mickle's request was a "cultural issue" and later mentioned that she was upset by the request because she felt singled out. [*Id.*] Mickle explained that she was trying to improve communication between the team. [*Id.*]

Baraona's performance ratings continued to decline. For 2018, she received a lower rating than the previous year, with "Needs Improvement" for all subcategories under "Teamwork and Cooperation" and "Meets Standard" for all other categories. [*Id.*, ¶14.] According to Mickle, Baraona continued to have difficulty with communication, "at times [made] little to no effort to be part of the team," and "had issues with her groups that have never been addressed with [me] until after the fact." [*Id.*] Despite seeing similar comments regarding teamwork and communication on consecutive reviews, Baraona testified that she "continued with the same things that [she had] always been doing." [*Id.*, ¶15; Dkt. 38-1 at 31.]

Following her 2018 performance review, Baraona received her performance evaluations later than other employees. [Dkt. 52, ¶58.] The Village asserts that

6

human resources took more time reviewing evaluations for employees with poor reviews, but Baraona maintains the reason was discriminatory. [*Id.*]

The Village implemented a new performance review system for 2019. [Dkt. 38-7 at 6.] When Baraona received her 2019 performance evaluation in 2020, she received a score of 12 out of a possible score of 30. [Dkts. 38-2 at 25; 38-17 at 12–21; 52, ¶20.] Mickle provided specific criticisms in the review, often including examples. [Dkt. 52, ¶20.] For instance, Mickle stated that Baraona: (1) "continues to exhibit difficulty with her customer service skills [and was] unable to resolve issues in a respectful manner . . . [Baraona] was encouraged to complete additional customer service training in July [ ] but declined to do so"; and (2) "struggled with customer service throughout the year. She can have difficulty over the phone, particularly when responding to individuals who may be experiencing difficulty . . . [she] can be perceived as rude and uncompromising when discussing policy and procedures . . ." [*Id.*] Baraona disagrees with each of the criticisms in the performance evaluation. [*Id.*, ¶21; Dkt. 55, ¶10.]

For her 2020 performance evaluation, Baraona scored 10 out of a possible score of 24, (Dkt. 38-17 at 22–29), and was rated as needing improvement with "Social Media," "Attitude/Organizational Pride," "Communication," "Customer Service," "Productivity and Quality of Work," and "Teamwork." [Dkt. 52, ¶22.] Baraona disputes the accuracy of this evaluation. [*Id.*; Dkt. 55, ¶14.]

7

In her 2021 performance evaluation, Baraona scored a 9 out of a possible score of 24. [Dkt. 52, ¶23.] Mickle criticized Baraona's failure to meet expectations in several categories; at the end of the evaluation, Mickle stated:

> During this past review period, Baraona has continued to make little to no effort to perform her job effectively. She also failed to accomplish many of the goals that were established during the past review period and which Baraona was told she must achieve as a condition of her continued employment. The Director met with and coached Baraona about her shortcomings on a regular basis; still Baraona did not heed the warnings to improve. Additionally, the Director issued disciplinary warnings to Baraona on 4/9/21 about her; FAILURE TO MEET DEADLINES, FAILURE TO COMMUNICATE, POOR CUSTOMER SERVICE and FAILURE TO REMAIN CURRENT WITH SOCIAL MEDIA. At this point, Baraona has failed to respond to constructive criticism, disciplinary action, coaching and other efforts to get her to try to meet the expectations of her position. Even when working on a reduced schedule where the Director relieved Baraona of her obligation to perform certain parts of her job, Baraona missed deadlines and failed to effectively communicate with others about the status of her projects. During this review period, Baraona's refusal to comply with basic courtesy practices (like updating calendars) has interfered with the purpose of the Niles Senior Center and demonstrated an inability or unwillingness to perform the job responsibilities of her position.

[*Id.* (cleaned up).] Baraona disputes the accuracy of Mickle's comments and ratings. [*Id.*] For almost all of her performance evaluations, Baraona maintains that she asked Mickle for specific examples regarding negative ratings, but Mickle was unable to provide any. [*Id.*, ¶¶11–15; Dkt. 55, ¶¶12–14.]

Sometime after issuing Baraona's 2021 performance evaluation, Mickle recommended Baraona for termination to human resources. [Dkt. 52, ¶24.] The Village terminated Baraona on October 22, 2021, and maintains that it did so based on her negative performance evaluations over several years. [*Id.*, ¶¶3, 24.] Baraona

disputes this and contends her termination was due to "false claims, disparate treatment compared to Caucasian employees, and retaliation." [*Id.*, ¶24.]

In her Amended Complaint, Baraona alleges the following claims under Title VII: discrimination and termination based on race (Counts I and IV); failure to accommodate her religious beliefs and terminating her for requesting a religious accommodation (Counts II and V); and retaliation and termination for complaints about discrimination (Counts III and VI). [Dkt. 18.] Baraona also alleges that she was subjected to a hostile work environment based on race and religion. [*Id.* at 2, 6, 8.] The Village has moved for summary judgment on all claims. [Dkt. 37.]

## II.    Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022). The Court "must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532 (7th Cir. 2013) (citation omitted).

## III.   Counts I and IV: Race Discrimination and Termination

### A.    Analytical Framework

In Counts I and IV of her Amended Complaint, Baraona alleges that she was discriminated against and terminated because of her race. Title VII of the Civil Rights

Act of 1964 makes it illegal for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); *Runkel v. City of Springfield*, 51 F.4th 736, 742 (7th Cir. 2022). A plaintiff will survive summary judgment if "the evidence would permit a reasonable factfinder to conclude that [his] race caused the discharge or other adverse employment action." *Wince v. CBRE, Inc.*, 66 F.4th 1033, 1040 (7th Cir. 2023) (cleaned up).

A Title VII plaintiff may either "prove discrimination in a holistic fashion," under *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016) or rely on the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) burden-shifting framework, "which gives the plaintiff the initial burden to establish a *prima facie* case of discrimination, after which the burden shifts to the defendant to provide a legitimate justification, before finally shifting back to the plaintiff to establish that such justification was pretextual." *Wince*, 66 F.4th at 1040 (cleaned up). Under either approach, the Court asks whether, looking at the record as a whole, "a reasonable jury could conclude that the plaintiff suffered the adverse employment action because of his membership in a protected class." *See Ortiz*, 834 F.3d at 764–65. It appears that Baraona wishes to proceed under both methods. [*Compare* Dkt. 51 at 9–10 (only discussing *Ortiz* and viewing all relevant evidence as a whole), *with id.* at 12–17 (arguing that the Village's performance claims were false and that Fahy is a proper comparator).]

"We may skip the *McDonnell Douglas prima facie* analysis if the employer raises the employee's performance as the reason for the adverse employment decision." *Vichio v. US Foods, Inc.*, 88 F.4th 687, 691 (7th Cir. 2023) (ADEA); *Brooks v. Avancez*, 39 F.4th 424, 435 (7th Cir. 2022) (stating, in the analogous Age Discrimination context: "[I]t is not always necessary to march through th[e] entire [*McDonnell Douglas*] process if a single issue proves to be dispositive. Here, as is often true, that issue is pretext or the lack thereof." (cleaned up)).

The critical question here is pretext. If an employer articulates a non-discriminatory basis for an adverse employment action, it is entitled to summary judgment unless there is a genuine dispute as to whether that reason was pretextual. *See Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 738 (7th Cir. 2013) ("[I]f there is no evidence of pretext, then [the] non-discriminatory justifications for firing [the plaintiff] must be believed, which necessarily precludes liability under Title VII." (citation omitted)). Further, "a showing of pretext alone is not enough; the plaintiff must also show that the explanations are a pretext for the prohibited animus." *Chatman v. Bd. of Educ.*, 5 F.4th 738, 747 (7th Cir. 2021) (cleaned up); *see also Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1105–06 (7th Cir. 2012) (explaining that evidence of bias does not support an inference of unlawful discrimination without evidence of a discriminatory motive).

The relevant question regarding pretext "is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered for the adverse action." *Liu v. Cook County*, 817 F.3d 307, 316

(7th Cir. 2016) (cleaned up); *see Chatman*, 5 F.4th at 746 ("[P]retext means a lie, specifically a phony reason for some action." (cleaned up)). A plaintiff can prove pretext in several ways, including "by identifying such weaknesses, implausibilities, inconsistencies, or contradictions in a stated reason that a reasonable trier of fact could find it unworthy of credence." *Liu*, 817 F.3d at 316 (cleaned up). But a plaintiff cannot survive summary judgment merely by raising a dispute as to the accuracy of the reasoning behind an adverse employment action—there must be evidence from which a jury could conclude that the employer acted with an illegal discriminatory motive. *See Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016) ("We do not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination." (cleaned up)).

### B. Analysis

Baraona was subjected to an adverse employment action in the form of her termination in October 2021. [Dkt. 52, ¶¶3, 24, 79.] The Village has put forth a legitimate, non-discriminatory reason for the termination—Baraona's "negative performance evaluations over a multi-year period." [*Id.*, ¶¶23–24.] In almost all of Baraona's performance evaluations, communication was described as an issue that needed to be remedied. Beginning with her 2017 performance evaluation, Mickle observed that "Baraona had difficulty [ ] with communication which has occasionally resulted in misunderstandings and frustration among team members[, and she] needs to work on expressing her views in team meetings as well as listening to the opinions of others." [Dkts. 38-17 at 5; 52, ¶11.] This trend continued in Baraona's 2018 performance review, which rated all subcategories under "Teamwork and

Cooperation" as "Needs Improvement": Baraona had "difficulty with communication," "at times [made] little to no effort to be part of the team," and "had issues with her groups" that were not addressed with Mickle. [Dkt. 52, ¶14.] Baraona testified that she "continued with the same things that [she had] always been doing." [*Id.*, ¶15; Dkt. 38-1 at 31.]

Baraona's 2019, 2020, and 2021 evaluations show that Baraona's communication skills did not improve. [Dkt. 52, ¶20 (2019 –"continues to have difficulty communicating with team members in meetings"); *id.*, ¶22 (2020 –"Needed improvement with regard to "Social Media," "Attitude/Organizational Pride," "Communication," "Customer Service," "Productivity and Quality of Work," and "Teamwork."); *id.*, ¶23 (2021 –"Failure to meet deadlines, failure to communicate, poor customer service and failure to remain current with social media").] Based on this history, there is no doubt that the Village documented its dissatisfaction with Baraona's job performance; thus, whether a reasonable jury could find that this reason was pretext for race discrimination is dispositive.

No reasonable jury could make that finding. Baraona argues that the Village's performance concerns are pretextual because Mickle "repeatedly refused" to provide her with examples of negative ratings. [Dkt. 51 at 20.] But Baraona offers no evidence that her employer did not honestly believe the reason it has offered, such as by pointing to evidence of implausibilities, shifting reasons or dishonesty. *Igasaki*, 988 F.3d at 958. It is clear from the record that Baraona disagreed with Mickle's evaluations and characterizations of her performance (Dkt. 55, ¶¶11–14), but mere

13

disagreement with a supervisor's performance evaluations does not establish pretext. *See Abebe v. Health & Hosp. Corp. of Marion Cnty.*, 35 F.4th 601, 607 (7th Cir. 2022) (fact that plaintiff disagreed with her supervisor's assessment" of poor communication skills "does not establish pretext" when plaintiff offered no contrary evidence); *Lauth v. Covance, Inc.*, 863 F.3d 708, 716 (7th Cir. 2017) (affirming summary judgment where plaintiff failed to provide evidence that the defendant's concerns about plaintiff's communication style and behavior were pretextual). As the Seventh Circuit has explained, the question "is not whether the ratings were right but whether the employer's description of its reasons is honest." *Igasaki*, 988 F.3d at 957–58 (quoting *Gustovich v. AT&T Commc'ns, Inc.*, 972 F.2d 845, 848 (7th Cir. 1992) (per curiam)); *see Ineichen v. Ameritech*, 410 F.3d 956, 961 (7th Cir. 2005) ("[I]t is not the court's concern that an employer may be wrong about its employee's performance, or be too hard on its employee." (cleaned up)). Thus, Baraona's dissatisfaction with Mickle's specific examples (or even the failure to provide examples) does not create a genuine fact issue on the question of pretext. [*See, e.g.*, Dkt. 52, ¶20 (denying all negative critiques and examples provided in her 2019 performance evaluation).]

Alternatively, Baraona argues that a jury could infer pretext from the Village's deviation from normal processes as it relates to the Village's outside investigation into Baraona's discrimination claims. [Dkt. 51 at 20–21.] It is true, as Baraona suggests, that "[a]n employer's unusual deviation from standard procedures can serve as circumstantial evidence of discrimination." *See Baines v. Walgreen Co.*, 863 F.3d 656, 664 (7th Cir. 2017) (citations omitted). The deviations Baraona identifies

14

include: (a) an outside investigator's failure to include "numerous incidents of discrimination" as described by Knapik-Warner during her interview in his report; (b) human resources' failure to interview a witness who could corroborate Baraona's complaints of discrimination; and (c) the fact that human resources' written summary of the outside investigator's findings referenced only recent complaints and omitted earlier incidents of discrimination. [Dkts. 53-10 at 2–7, 10–18; 55, ¶¶58–59.]

Even assuming Baraona is correct about these discrepancies, they have nothing to do with race. The cited deviations are irrelevant to the question of whether the Village believed it had a legitimate, non-discriminatory basis to terminate her. Pretext requires the true motive for an employer's action to be illegal discrimination, and without evidence permitting a jury to infer that motive, Baraona's claim fails even if Mickle or others deviated from standard procedures or treated her unfairly. *See Chatman*, 5 F.4th at 747 ("[A] showing of pretext alone is not enough; the plaintiff must also show that the explanations are a pretext for the prohibited animus."); *Brown*, 700 F.3d at 1105–06 ("[T]he fact that someone disagrees with you (or declines to take your advice) does not, without more, suggest that they discriminated against you."). On this record, a jury could not find that illegal discrimination was the reason for the termination.

To the extent Baraona attempts to prove she was treated less favorably than a similarly situated comparator—Fahy—this is another valid way to show pretext. *See, e.g., Khowaja v. Sessions*, 893 F.3d 1010, 1015 (7th Cir. 2018) (*McDonnell Douglas*'s "similarly situated and pretext analysis often overlap, as comparator evidence … [is]

15

relevant to both inquiries" (citation omitted)); *Coleman v. Donahoe*, 667 F.3d 835, 852–53 (7th Cir. 2012) (in the *McDonnell Douglas* context, "a discrimination plaintiff may employ . . . comparator evidence to discharge her burden at the pretext stage").

> Although a comparator need not be identically positioned, a plaintiff must show the purported comparator was directly comparable to her in all material respects so as to eliminate other possible explanatory variables. Relevant factors include whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications.

*Crain v. McDonough*, 63 F.4th 585, 592 (7th Cir. 2023) (cleaned up); *see also Downing v. Abbott Lab'ys*, 48 F.4th 793, 805–06 (7th Cir. 2022) (plaintiff and comparator must "have engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their employer's treatment of them" (internal quotation omitted)). But Fahy does not allow for a "meaningful comparison" because Baraona adduces no evidence that Fahy engaged in similar conduct but was treated more favorably by Mickle. *Abebe*, 35 F.4th at 607. It is undisputed that Fahy, who was also a Program Coordinator, is Hispanic, and who reported to Mickle, consistently received positive performance evaluations from Mickle, and the record contains no evidence that Fahy was ever disciplined for any reason. [Dkt. 52, ¶73.] Thus, a jury could not infer race discrimination based on differing treatment.

Finally, *Ortiz* holds that "all evidence belongs in a single pile and must be evaluated as a whole." 834 F.3d at 766. But nothing the Court has discussed thus far constitutes any evidence of racial discrimination; even in a pile, it does not amount to evidence from which a jury could reasonably conclude that the adverse employment action was because of membership in a protected class. Since "there is no evidence of

pretext," the "non-discriminatory justifications" for Baraona's termination "must be believed, which necessarily precludes liability under Title VII." *Hitchcock*, 718 F.3d at 738 (citation omitted). Therefore, the Village is entitled to summary judgment on Baraona's race discrimination claim.

## IV. Counts II and V: Religious Accommodation and Termination

Next, the Court considers Baraona's claim that the Village discriminated against her by failing to accommodate her religious beliefs and for wrongfully terminating her for requesting a religious accommodation.

Title VII forbids employment discrimination on account of religion. *See* 42 U.S.C. § 2000e-2(a)(1). Employers must provide reasonable accommodations for employees' religious practices unless any reasonable accommodation would pose an undue burden on the employer. *Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 448 (7th Cir. 2013). The reasonable accommodation requirement is intended "to assure the individual additional opportunity to observe religious practices, but it [does] not impose a duty on the employer to accommodate at all costs." *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 70 (1986). A "reasonable accommodation" of an employee's religious practices is "one that 'eliminates the conflict between employment requirements and religious practices.'" *Porter v. City of Chicago*, 700 F.3d 944, 951 (7th Cir. 2012) (citing *Wright v. Runyon*, 2 F.3d 214, 217 (7th Cir. 1993)). However, a permissible accommodation will not necessarily be the option most preferable for the employee. *Ansonia Bd. of Educ.*, 479 U.S. at 69.

To make out a *prima facie* case, Baraona must demonstrate that: "(1) an observance or practice that is religious in nature, and (2) that is based on a sincerely

held religious belief, (3) conflicted with an employment requirement, and (4) the religious observance or practice was the basis or a motivating factor for the employee's discharge or other discriminatory treatment." *Kluge v. Brownsburg Cmty. Sch. Corp.*, 64 F.4th 861, 883 (7th Cir. 2023) (vacated on other grounds).[4] "If the employee shows these elements, the burden then shifts to the employer to show that it could not accommodate the employee's religious belief or practice without causing the employer undue hardship." *Adeyeye*, 721 F.3d at 449 (citation omitted).

The parties do not dispute the first two elements: Baraona is a Jehovah's Witness, and her beliefs are sincerely held. [Dkt. 52, ¶59.] Baraona's Amended Complaint alleges that the Village failed to reasonably accommodate her regarding the year-end holiday party,[5] which Baraona could not attend on religious grounds. [Dkt. 18 at 7–8.][6] The Village maintains that all Village employees were subject to the same policy,[7] which included options to attend or not attend, with or without pay.

---

[4]    *Groff v. DeJoy*, 600 U.S. 447 (2023), articulated a new framework for "undue hardship." The Village's motion does not raise the undue hardship defense, and the Seventh Circuit did not express disapproval of its articulation of the elements of a *prima facie* case in *Kluge*, 2023 WL 4842324, at *1 (7th Cir. July 28, 2023).

[5]    Baraona makes no attempt to develop or defend the allegation in her Amended Complaint that the Village failed to accommodate her need to attend worship services, [*see* Dkts. 18 at 7; 39 at 14; 51], thus she has abandoned this claim. *See Little v. Mitsubishi Motors North Amer., Inc.*, 261 F. App'x 901, 903 (7th Cir. 2008) (plaintiff who "failed to present facts or develop any legal arguments" as to certain claims in response to motion for summary judgment deemed to have abandoned them).

[6]    Baraona addresses her religious restrictions surrounding birthday celebrations, including signing birthday cards, as evidence of her hostile work environment claim, (Dkt. 51 at 18–19), so the Court follows her lead and addresses this below.

[7]    The Village maintains the policy is neutral but the Supreme Court has explained Title VII requires "an otherwise-neutral policy to give way to the need for an accommodation." *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 775 (2015) (explaining that an employer cannot take refuge behind a neutral policy if something more is required reasonably to accommodate a religious need).

[Dkt. 52, ¶66.] Baraona's response brief does not seriously engage with this argument or squarely address how her religious decision not to attend the party conflicted with any Village employment *requirement*. To the contrary, at her deposition, Baraona testified that attendance at the holiday party was *not required*. [Dkts. 52, ¶66; 38-1 at 50 ("All of the other employees in my department either went to the holiday party or they elected not to go just because they did not care to attend.").]

Baraona's only other argument is that, unlike those employees who attended the party, she "did not have the benefit . . . of being able to leave work early with full pay for the entire day." [Dkt. 51 at 19.] In Baraona's view, the Village "did not offer any accommodation that would have placed [her] on the same footing as those who had the option of attending the party." [*Id.*] Aside from failing to develop this argument, and thus waiving it, *see Riley v. City of Kokomo*, 909 F.3d 182, 190 (7th Cir. 2018), by Baraona's own admissions, no conflict exists. Having failed to offer any evidence that she was unlawfully subject to an employment requirement that conflicted with her religion, the Village is entitled to summary judgment on Baraona's failure to accommodate claim.

## V. Hostile Work Environment

### A. Analytical Framework

The Court next considers Baraona's claim that she was subjected to a hostile work environment based on both her race and religion. "An employer creates a hostile work environment when 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"

*Hambrick v. Kijakazi*, 79 F.4th 835, 842 (7th Cir. 2023) (quoting *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014)). To prove a hostile work environment based on either race or religion, Baraona must show that "'(1) the work environment was both objectively and subjectively offensive; (2) the harassment was based on membership in a protected class or in retaliation for protected behavior; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability. *Mahran v. Adv. Christ Med. Ctr.*, 12 F.4th 708, 714 (7th Cir. 2021) (quoting *Abrego v. Wilkie*, 907 F.3d 1004, 1015 (7th Cir. 2018)). Whether there is a basis for employer liability "depend[s] on whether the alleged harasser is the victim's supervisor or coworker." *Trahanas v. Nw. Univ.*, 64 F.4th 842, 853 (7th Cir. 2023) (citation omitted). In contrast to when the harassment comes from a supervisor, "when the harasser is a coworker, 'the employer is liable only if it was negligent in controlling working conditions.'" *Id.* (quoting *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013)).

Baraona bases her hostile work environment claim primarily on Mickle's actions as her supervisor, though the Court also addresses the Village's potential liability based on co-worker harassment. *Trahanas*, 64 F.4th at 853–55. "[C]ourts consider the totality of the circumstances when determining whether conduct is severe or pervasive," which "includes (1) the frequency of the discriminatory conduct; (2) how offensive a reasonable person would deem it to be; (3) whether it is physically threatening or humiliating conduct as opposed to verbal abuse; (4) whether it unreasonably interferes with an employee's work performance; and (5) whether it is

directed at the victim." S*caife v. United States Dep't of Veterans Affs.*, 49 F.4th 1109, 1115–16 (7th Cir. 2022) (citation omitted).

### B.    Hostile Work Environment Based on Race

#### 1.    Supervisor Harassment

Baraona's briefing fails to identify with precision which incidents spanning from 2015 to 2021 form the basis of her hostile work environment claim, [*see* Dkt. 51 at 7, 13, 16–19], so the Court has done its best to summarize them here. Baraona alleges that Mickle created a racially hostile work environment by: (1) paying Baraona's vendors late in 2016; (2) disciplining Baraona in 2017; (3) not "allowing" Baraona to attend a senior health training seminar in 2018; (4) subjecting Baraona to an investigation in 2018 arising from a complaint about bereavement leave; (5) disciplining, warning, and admonishing Baraona (including by requiring her to complete customer service training) in 2019; (6) providing Baraona her performance reviews later than others; (7) stating that vendor Davis-Loyd complained about communication difficulties with Baraona; (8) making an insensitive comment about a homeless woman arrested for trespassing at the Senior Center;[8] (9) selecting a COVID-19 mask that resembled "black-face" as the winner of a best mask contest; and (10) admonishing Baraona in 2020. [Dkts. 45-1 at 95−96; 52, ¶¶30, 33–44, 54–56, 58, 61; 55, ¶¶16–17, 22, 24–29, 36, 40–41, 50.]

Construed in Baraona's favor, she has not established a genuine dispute of material fact with respect to Mickle's alleged harassment. First, most of the incidents

---

[8]    It is unclear from the record whether Baraona was present when Mickle made these statements. Only Knapik-Warner testified about it. [Dkt. 55, ¶50.]

Baraona identifies are perceived slights and ordinary workplace disputes that no reasonable jury could find were based on Baraona's race. *See Lucero v. Nettle Creek School Corp.*, 566 F.3d 720, 729 (7th Cir. 2009) ("'[P]etty slights, minor annoyances, and simple lack of good manners' are normally not sufficient to deter a reasonable person."). For example, Baraona claims that Mickle delayed payments to her vendors, "including black entertainers . . . as compared to payments for Fahy's and Blickhahn's vendors and entertainers . . ." [Dkts. 55, ¶40; *see* 52, ¶30.] However, at her deposition, Baraona testified that she only recalled this happening twice and that payments to non-Black vendors booked by other Program Coordinators were also sometimes late. [Dkt. 38-1 at 17–18 (explaining that non-Black staff members complained about late payments to non-Black vendors over the course of her employment, which was generally unusual); *id.* at 18–19 ("Q.: On how many occasions in 2016 would you say that you felt a vendor had not been paid in a timely fashion because of their race? A.: I know of one offhand and I also complained later on in the year.").] She also testified that the Village's finance department—not Mickle—was responsible for paying vendors after invoices were submitted. [*Id.* at 18 (explaining that after submitting invoices to Knapik-Warner, the information went to the finance department and "[t]hey actually are the ones who cut the check . . .").] Thus, by Baraona's own admission, there is no basis from which to conclude that delayed payments to vendors were because of membership in a protected class.

The same holds true for Baraona's allegation that in 2018, Mickle did not permit her to attend a senior health training opportunity. [Dkt. 52, ¶¶39−40.] It is

undisputed that Baraona—unlike Fahy and Blickhahn—did not respond to Mickle's invitation to attend the training immediately. [Dkt. 38-1 at 45 ("Q. Why did you wait two weeks to respond to the offer for training then? A. I don't know. I filled out the paperwork and just had it on my desk. I don't remember why I didn't respond, but I printed it and filled it out and just had it sitting on my desk.").] It is also undisputed that when Baraona informed Mickle that she wanted to attend, Mickle told Baraona that she should not attend the same training as Fahy and Blickhahn because at least one Program Coordinator needed to remain at the Senior Center; Mickle offered Baraona a different session to attend but Baraona declined; and Baraona eventually attended the senior health training and received her certification. [*Id.* at 44−45 (Baraona testifying that she attended the training in 2020 during COVID); Dkt. 52, ¶¶39−40.] On these undisputed facts, and even construing all reasonable inferences in Baraona's favor, no reasonable jury could find that Mickle did not allow her to attend the training opportunity because of her race.

Likewise, Baraona's claim that she was subject to "repeated baseless discipline" (Dkt. 51 at 16) is inadequate to establish a hostile work environment. Baraona has not identified any alleged discipline tied to her race or any discipline imposed on her that had anything whatsoever to do with race. The disciplinary incidents she has identified—suspending her corporate credit card privileges after leaving a large tip, an investigation into bereavement leave, issuing a disciplinary memorandum for being disruptive, or requiring her to complete a training course following an incident with a Senior Center member—do not touch upon race. *See*

*Boss*, 816 F.3d at 920 (concluding that plaintiff had not suffered from an objectively hostile work environment after being placed on a performance improvement plan, marked as absent without leave, and criticized for not attending a conference—"[t]he record contained not a single racially offensive email, remark, or other hint of racial animus."). Although the conduct need not be overtly racial to be actionable, Baraona must show that "it had a racial character or purpose." *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011) ("[t]o support a hostile work environment claim, the plaintiff need not show that the complained-of conduct was explicitly racial, but must show it had a racial character or purpose." (quoting *Vance v. Ball State Univ.*, 646 F.3d 461, 470 (7th Cir. 2011))). Baraona has offered no evidence from which a reasonable jury could make such a finding.

The second category of allegations includes an incident involving Mickle that was more overtly racial. Baraona asserts that in 2020, Mickle selected a mask that resembled "black-face" with exaggerated large lips worn by a Senior Center resident as the winner of the best mask contest and asked Baraona to post a picture of it on social media. [Dkts. 52, ¶¶54–56; 55, ¶41.] An isolated event can sometimes create a hostile environment. *See Scaife*, 49 F.4th at 1116 ("Because the N-word is egregious, we are not concerned with the number of times the epithet is used. A one-time use of the epithet can in some circumstances warrant Title VII liability." (citations omitted)); *Jackson v. Cnty. of Racine*, 474 F.3d 493, 499 (7th Cir. 2007) ("one instance of conduct that is sufficiently severe" may be sufficient). But there must be sufficient

evidence from which a factfinder could reasonably conclude that the harassing conduct was either severe or pervasive. *Jackson*, 474 F.3d at 499.

The record in this case does not support such a finding. There is no doubt that Mickle's decision to select the mask as the contest winner and asking Baraona to post a picture of it on social media was abhorrent. Still, the incident was isolated— Baraona has not identified any other incidents at any point during her tenure at the Senior Center with Mickle that were connected to race—and for the reasons just discussed, the record does not support "a reasonable inference that most of the hostility [Baraona] encountered was connected to [her] race." *See Cole v. Bd. of Tr. of N. Ill. Univ.*, 838 F.3d 888, 897 (7th Cir. 2016) (concluding that most of the alleged harassment encountered by plaintiff was not connected to his race—"[t]here [was] almost no evidence of racial animus in the record: no hostile or ambiguous remarks, no racial slurs, nothing beyond the notable exception of the [discovery of a] noose and secondhand report of a racist sign posted somewhere, at some unknown time by some unknown person."); *see also Lucero*, 566 F.3d at 732 (plaintiff-teacher's complaints about two incidents, one involving a student who held up a partially nude photograph in class and another involving playboy magazines in the classroom, were isolated such that they were neither sufficiently severe or pervasive to rise to the level of actionable harassing conduct.").

Nor has Baraona alleged any physically threatening or humiliating conduct, or that any conduct unreasonably interfered with her work performance. The mask incident, analyzed in context, while undoubtedly offensive and inappropriate, is not

25

severe or pervasive such that a jury could reasonably conclude that the work environment was "permeated with discriminatory intimidation, ridicule, and insult." *Trahanas*, 64 F.4th at 853 (internal quotation omitted); *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 645 (7th Cir. 2005) ("It is well settled that 'relatively isolated instances of non-severe misconduct will not support a claim of a hostile environment.'" (citation omitted)). As a result, and with respect to her hostile work environment claim based on Mickle's harassment, Baraona has not established a triable issue of fact.

## 2.    Co-worker Harassment

Construed in her favor, the record also would not allow a reasonable jury to find that Baraona's co-workers mistreated her based on her race and that her mistreatment was both objectively offensive and severe or pervasive. *See Trahanas*, 64 F.4th at 853. Baraona identifies the following offensive comments or incidents involving her co-workers that support her claim of a racially hostile work environment: (1) a receptionist stated on more than one occasion that "only civilized countries speak English," and Mickle laughed at the comment; (2) Fahy, a Hispanic woman, said "Me no habla Ingles" in front of employees and residents when faced with difficult questions; (3) Fahy used the term "dago tees" on one occasion when describing an item of clothing; (4) Knapik-Warner made a "throwing motion" at Baraona and spoke Polish in front of her instead of English; and (5) Fahy led Davis-

Loyd to believe that Baraona no longer worked at the Senior Center in October 2020. [Dkts. 38-1 at 20; 52, ¶¶31, 45, 49–52; 55, ¶¶26–27, 45.][9]

Some of these incidents were surely unpleasant, but Baraona offers no evidence that her co-workers acted with animus toward her race, and a reasonable jury could not infer such animus from these comments alone, however rude they may have been. For instance, Baraona testified that on one occasion Knapik-Warner brought paperwork to Baraona's office and made a "throwing motion" toward her desk, and that Knapik-Warner would, at times, "abruptly speak Polish" or "immediately switch to another language" when Baraona entered the room. [Dkt. 38-1 at 20.] But Baraona herself testified that she and Knapik-Warner did not get along on an "interpersonal level," for reasons unrelated to Baraona's race. [*Id.* ("Q.: Did you believe that [Knapik-Warner had issues with her] because you are black? A.: I questioned it. I would not say I believed it, but I did question it."); *id.* ("Q.: So, it could be personal to you and have nothing to do with your race. A.: That's possible.").]

These events, and others Baraona identifies, fail to establish a connection between the conduct and Baraona's race. And while the connection "need not be explicit, there must be *some* connection, for not every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the complaining employee belongs to a racial minority." *Cole*, 838 F.3d at 896 (emphasis in original); *Brooks*, 39 F.4th at 441 ("[O]ther complaints [plaintiff] had about her

---

[9]     Aside from the first incident, it is unclear from the record whether Mickle was present for any of the other alleged conduct involving co-workers. [*See, e.g.*, Dkt. 52, ¶30 (Knapik-Warner making a "throwing motion" at Baraona and speaking in Polish instead of English).]

coworkers' abusive conduct—swearing, refusing to follow her directions, using disrespectful language—were not focused on [any protected category] and thus could not create a hostile work environment on the basis of a protected category.").

Still, other comments Baraona identifies—that "only civilized countries speak English" and "dago tees"—were ignorant and insensitive, but not actionable if only because the comments were not directed at Baraona. *See Mahran*, 12 F.4th at 716 ("[I]solated, offhand comments—not directed at [Plaintiff] himself—do not amount to an objectively hostile work environment"); *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 881 (7th Cir. 2018) ("[E]mployers generally do not face liability for off-color comments, isolated incidents, teasing, and other unpleasantries that are, unfortunately, not uncommon in the workplace."); *Villarruel v. Mukasey*, 266 F. App'x 473, 475–76 (7th Cir. 2008) (observing that the statement "people who are in America should speak English," is not a statement that would permit a reasonable trier of fact to conclude "that working conditions for [a protected class] were materially worse than those for employees of other ethnic backgrounds.")

Considering the totality of circumstances, Baraona has failed to show that comments by her co-workers were severe enough for a jury to find that she experienced a hostile work environment based on race.[10]

---

[10]  When "the harasser is a coworker, 'the employer is liable only if it was negligent in controlling working conditions.'" *Vance*, 570 U.S. at 424. Thus, the Court need not reach the liability question.

28

### B. Hostile Work Environment based on Religion

### 1. Supervisor Harassment

The Amended Complaint also asserts that Mickle subjected Baraona to a hostile work environment based on her religion in violation of Title VII. But the conduct Baraona complains of does not qualify as objectively offensive harassment based on religion, nor could a jury reasonably conclude that the conduct was so severe or pervasive that it altered the conditions of her employment.

Baraona asserts that Mickle created a hostile work environment by: (1) convening a staff meeting in 2017 "under false pretenses for the sole purpose of a birthday celebration"; (2) "repeatedly" asking Baraona to sign birthday cards even though Mickle knew of Baraona's religious restrictions; and (3) asking Baraona on one occasion to make a birthday card and attend a celebration for a Senior Center member's 101st birthday. [Dkts. 38-1 at 47–49; 52, ¶¶60–63; 55, ¶¶51, 55.]

First, the frequency of the discriminatory conduct is among the factors the Court should consider, though the Seventh Circuit has indicated there is no "magic number" of instances required to demonstrate a hostile work environment. *Alamo v. Bliss*, 864 F.3d 541, 549 (7th Cir. 2017). Although Baraona testified that Mickle "repeatedly tried to force her" to participate in activities that would violate her religious beliefs and "always" gave her birthday cards to sign, [Dkt. 38-1 at 48], she makes no attempt to quantify the number of times this occurred over the course of her employment. [*See* Dkts. 55, ¶¶51−52; *see also* 38-1 at 48 ("So, over the course of the next few years, [Mickle] would always give me birthday cards as they were going around the office . . . I communicated this [religious restriction] over the years, but it

was more of an impact thing, I let it go.").] Baraona points to Knapik-Warner's testimony to support her assertions, but Knapik-Warner could only recall two instances where she saw Mickle ask Baraona to sign a birthday card. [Dkt. 53-2 at 49−50 (stating that she witnessed Mickle asking Baraona to sign a birthday card "[p]robably in 2019 . . . it definitely was before COVID and I believe there was a time when we came back after being closed.").] These few incidents, spanning over the course of six years, are simply too infrequent to create a hostile work environment. *See Filipovic v. K&R Exp. Sys., Inc.*, 176 F.3d 390, 398 (7th Cir. 1999) (four national-origin comments made over the course of more than a year were too infrequent to sustain a hostile work environment claim).

Second, the Court accepts as true Baraona's statement that shortly after she was hired in 2015, she informed the Senior Center that she does not participate in birthday celebrations or sign birthday cards on religious grounds. [Dkt. 55, ¶51.] As such, Mickle's request that Baraona attend a staff meeting in 2017 where a birthday gift was presented to a maintenance worker, or her request that Baraona make a birthday card for a Senior Center member who had turned 101, was both inappropriate and insensitive. But this conduct, even when considered in combination with an unspecified number of requests to sign birthday cards, does not rise to the level of objectively offensive. Although the conduct was directed at Baraona, it was not physically threatening, humiliating, or even verbally abusive, and there is no evidence to suggest that Mickle's statements interfered with Baraona's work performance. In short, the relevant factors do not suggest that the

workplace was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Hambrick*, 79 F.4th at 842. Drawing all reasonable inferences in her favor, and considering the totality of Mickle's conduct, no reasonable jury could find that these birthday-related incidents over the course of Baraona's employment rose to the level of an objectively offensive environment.

Baraona further claims that on one occasion, Mickle made "dismissive comments" toward Baraona for supporting Jehovah's Witnesses' rights to practice their religion in Russia and about a child who prayed before eating meals. [Dkts. 53-13 at 10; 55, ¶55.] Setting aside the vague nature of this statement, *see Porter*, 700 F.3d at 956 ("vague and conclusory allegations of being harassed and intimidated by her supervisors do not change our conclusion; without more detail, a reasonable jury could not find that the conduct was objectively offensive, severe, or pervasive"), this evidence falls woefully short of the sort of religious hostility that has survived summary judgment. *Cf. Shanoff v. Ill. Dep't of Hum. Servs.*, 258 F.3d 696, 698–99 (7th Cir. 2001) (reversing summary judgment on a hostile religious environment claim where plaintiff's supervisor referred to him as a "haughty Jew," told him she knew "how to put you Jews in your place," responded to request for time off for religious holiday by saying, "I don't give a damn about your holidays," and said she intended to impede his career).

Construed in Baraona's favor, Mickle's comments and insensitive requests— though undoubtedly offensive to Baraona—did not create a religiously hostile work

environment. Baraona has identified several problematic comments over the course of her six years of employment, but she has not shown that any of the incidents, independently or in combination, contributed to an environment of severe or pervasive religious harassment. *Mahran*, 12 F.4th at 715.

### D. Hostile Work Environment based on Race and Religion

Baraona asks the Court to "consider incidents of religious discrimination alleged by Plaintiff along with the numerous racial incidents when deciding if there is a hostile work environment." [Dkt. 51 at 18.] The Seventh Circuit has likewise cautioned that district courts should "not carve up the incidents of harassment and then separately analyze each incident, by itself, to see if each rise to the level of being severe or pervasive." *Scaife*, 49 F.4th at 1118 (citation omitted)). "Thus, when a plaintiff claims that he or she is suffering a hostile work environment based on the conduct of supervisors and coworkers, all instances of harassment by all parties are relevant to proving that an environment is sufficiently severe or pervasive." *Id.* (citing *Mason v. S. Ill. Univ. at Carbondale*, 233 F.3d 1036, 1045 (7th Cir. 2000)).

Considering Baraona's evidence holistically, and in the aggregate, she has failed to show a hostile work environment. Mickle's role in the mask incident, for example, has no relation to the instances in which Baraona was asked to sign birthday cards or participate in a celebration. Nor has she demonstrated that the incidents were sufficiently severe as to alter her working conditions or create an abusive environment. *Hambrick,* 79 F.4th at 843; *see Scaife*, 49 F.4th at 1118 (rejecting hostile work environment claim based on race and gender, and explaining, under the totality of the circumstances, the use of the N-word by a supervisor and

encouragement to act illegally by a co-worker was offensive but not sufficiently severe or pervasive to alter the conditions of employment). Baraona, therefore, has failed to show that she endured a hostile work environment based on both race and religion.

## VI.  Counts III and VI: Retaliation

Finally, Baraona claims that the Village retaliated against and terminated her in response to her complaints about discrimination. Title VII prohibits retaliation against employees who engage in protected activity, which includes "punishing employees for complaining about discrimination or other practices that violate Title VII." *Sitar v. Indiana Dep't of Transportation*, 344 F.3d 720, 727 (7th Cir. 2003). "As with discrimination claims, the question for a retaliation claim should always be: 'Does the record contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the discharge?'" *Igasaki*, 988 F.3d at 959 (quoting *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016)); *Ortiz*, 834 F.3d at 765.

To survive summary judgment, Baraona has the burden of producing enough evidence for a reasonable jury to conclude that: (1) she engaged in a statutorily protected activity; (2) the employer took a materially adverse action against her; and (3) there was a but-for causal connection between the two. *Gnutek v. Ill. Gaming Bd.*, 80 F.4th 820, 824 (7th Cir. 2023) (citing *Univ. of Texas Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338, 361 (2013)). To demonstrate a causal connection a plaintiff can rely on "circumstantial evidence, which may include suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual." *Gnutek*, 80

33

F.4th at 824 (citation omitted). Regardless of the type of evidence presented, "[t]he key question is whether a reasonable juror could conclude that there was a causal link between the protected activity or status and the adverse action." *Id*. (citation omitted).

The parties do not dispute that Baraona made several internal complaints about discrimination that qualify as protected activity, (Dkt. 52, ¶76), as does her complaint filed with the EEOC. *Salas v. Wis. Dep't of Corr.*, 493 F.3d 913, 924 (7th Cir. 2007) ("Protected activities include opposing employment practices made unlawful under Title VII, whether internally or by filing a charge or participating in a Title VII investigation.").

As to the second element, Baraona argues that the retaliatory acts were her delayed 2019 performance review, the negative performance review itself, and her termination. [Dkts. 51 at 19–20; 55, ¶62.] But only her termination in October 2021 constitutes an adverse employment action.

For purposes of retaliation, an adverse employment action is one that "well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Abebe*, 35 F.4th at 606 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). But negative performance reviews, written warnings, and placement on performance improvement plans are not adverse actions when they are unaccompanied by a quantitative or qualitative change in the terms of employment. *Lauth*, 863 F.3d at 717; *Gaston v. Bd. of Educ. of City of Chicago*, 2019 WL 398688, at *4 (N.D. Ill. Jan. 31, 2019) (collecting cases). In this case, Baraona

34

provides no evidence permitting the inference that the delay in receiving her 2019 performance review or the negative review itself resulted in any meaningful consequence. Thus, the Court examines whether there is a causal link between Baraona's termination and her protected activity.

Baraona has failed to put forth sufficient circumstantial evidence establishing that link. In a wholly undeveloped way, Baraona suggests that Mickle "was frustrated that [Baraona] complained to HR" about the mask, and that the timing of Baraona's EEOC filing in December 2019, followed by the delayed and negative performance rating, later resulted in her "termination based on false performance claims and discipline based on false allegations." [Dkt. 51 at 20.] To the extent Baraona relies on suspicious timing, an inference of retaliation based on suspicious timing requires the time period between the protected action and the alleged adverse action to be "very close." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001). The twenty-two month gap between Baraona's EEOC filing and her termination is simply too attenuated. *Lewis v. Holsum of Fort Wayne, Inc.*, 278 F.3d 706, 711 (7th Cir. 2002) (holding three-month interval did not raise inference of retaliatory intent).

And to the extent Baraona suggests that performance concerns and disciplinary action were mistaken or misplaced such that they must have been retaliatory, this argument also fails. "[F]airness of a particular action or the accuracy of an employer's belief about an employee's job performance have no place in determining whether the employer acted based on an improper motive." *Lauth*, 863 F.3d at 717. As already discussed, it is clear that Baraona strongly disagreed with

35

her performance evaluations, but that disagreement "is irrelevant to our inquiry." *Id*. Absent evidence "other than [her] own speculation" that her employer "used complaints and the documented history of [ ] communication issues as a cover for its retaliatory motive," there is insufficient evidence from which a jury could infer the required causal link. *Id*. Because Baraona has not provided sufficient evidence from which a reasonable jury could conclude that the Village retaliated against her, the Village is entitled to summary judgment on her retaliation claims.

## V.    Conclusion

For the reasons stated above, the Village's motion for summary judgment is granted.

Enter: 21 CV 1951
Date:  March 8, 2024

_____
Lindsay C. Jenkins
United States District Judge